IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LEDRA WELCH-WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12CV149 |
| | ) | |
| GUILFORD COUNTY BOARD OF | ) | |
| EDUCATION, MICHELLE THIGPEN, | ) | |
| individually and in her capacity as Principal, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion to Dismiss [Doc. #14] filed by Defendant Guilford County Board of Education ("Defendant Board of Education") and Defendant Michelle Thigpen ("Defendant Thigpen"). Plaintiff Ledra Welch-Walker is a former elementary school teacher who asserts claims pursuant to 42 U.S.C. § 1983, alleging that Defendants violated her Fourteenth Amendment due process rights by not renewing her probationary teaching contract. Plaintiff also claims that Defendant Thigpen maliciously interfered with her teaching contract in violation of North Carolina law. For the reasons stated below, Defendants' Motion to Dismiss should be granted, and this action should be dismissed.

I.     FACTS, CLAIMS, AND PROCEDURAL HISTORY

Plaintiff Ledra Welch-Walker, proceeding *pro se*, alleges in her Complaint that she was employed by Defendant Board of Education pursuant to a probationary teaching contract. (Compl. [Doc. #2] ¶ 5.) Plaintiff alleges that in August 2009 she was transferred from Parkview Elementary School to Colfax Elementary School where Defendant Thigpen was the principal.

(Id. ¶¶ 8, 16.)  Plaintiff alleges that when she was transferred to Colfax, Defendant Thigpen was unhelpful in setting up Plaintiff's second-grade classroom and in helping acclimate Plaintiff to her new environment at Colfax.  Plaintiff further alleges that Defendant Thigpen required Plaintiff to submit her lesson plans every Monday, gave Plaintiff extra duties preparing a newsletter, and told Plaintiff to change the order in which she taught her subjects. Plaintiff also alleges that Defendant Thigpen placed students who had parents with "strong personalities" in her classroom.  Plaintiff states that she began having problems with the parents of the students in her classroom, and that after the school's open house, the parents "started bombarding" her with numerous emails and phone calls.  (Id. ¶ 38.)  Plaintiff states that the parents began an online blog about Plaintiff "expressing their desire to get rid of Plaintiff."  (Id. ¶ 40.)  In September 2009, Defendant Thigpen allegedly told Plaintiff that the parents were complaining about Plaintiff's homework assignments, guided reading, and newsletters.  Plaintiff claims that the parents violated school policy by complaining directly to the principal rather than to her. Plaintiff further contends that on September 23, 2009, Defendant Thigpen "held a secret meeting with a parent who asked Defendant Thigpen to remove his son from Plaintiff's classroom because he did not like Plaintiff or her teaching style."  (Id. ¶ 43.)  Three days later, Defendant Thigpen allegedly "wrote Plaintiff up based upon the Parent's allegations" without giving Plaintiff an opportunity to respond.  (Id. ¶ 44.)

Plaintiff further alleges that in October 2009, Defendant Thigpen placed her on an "action plan."  Plaintiff also alleges that during that same month, a parent sneaked into her classroom before school and began ransacking Plaintiff's desk.  When Plaintiff entered the

2

room, the parent started yelling at Plaintiff.  Plaintiff exited the room, but the parent followed her into the hallway screaming.  Defendant Thigpen came into the hallway, saw the parent, and the parent told Defendant Thigpen that she wanted Plaintiff fired and her son removed from Plaintiff's classroom.  (Id. ¶¶ 47-53.)  The parent then allegedly stated that she wanted a meeting with administration and did not want "that Black Supervisor to be at this meeting."  (Id. ¶ 54.)  Defendant Thigpen then allegedly asked the parent, "You don't want to have this conversation now do you?"  (Id. at 57.)  Plaintiff alleges that she is black but these parents and Defendant Thigpen are white.  (Id. at 59.)  According to Plaintiff, Defendant Thigpen "communicated to parents that she too wanted Plaintiff gone, that her hands were tied, and that it was her goal to have Plaintiff gone by November 01, 2009."  (Id. ¶ 58.)

Plaintiff also accuses Defendant Thigpen of taking confidential information about the disability of one of Plaintiff's daughters and informing Defendant Board of Education about it in an effort to prejudice the Board against Plaintiff.  In addition, Plaintiff alleges that Defendant Thigpen accused Plaintiff of not giving a student his medicine and noted the incident in Plaintiff's personnel file, even though Plaintiff provided evidence that she had in fact given the student his medicine.  Plaintiff states that when she complained to school personnel about her treatment, she was told that she should resign.  Plaintiff alleges that she was subsequently suspended with pay for a few days. When she returned from suspension, her belongings were packed up.  Plaintiff alleges that in May 2010, she received written notice that she was being recommended for non-renewal of her teaching contract.  She then requested a hearing and copies of the documents that were to be provided as the basis for the non-renewal.  Plaintiff

3

alleges that she received the documents on May 17, 2010. Plaintiff states that ten days later, on May 27, she received a telephone call and was told that she had three hours to send her response. (Id. ¶ 87.) She was told that the Board "was going to hold a hearing without her." (Id. ¶ 88.) She "rushed to prepare something, but was not able to accurately refute the hundreds of documents in the time allotted." Shortly thereafter, Plaintiff was informed that she had not been renewed. (Id. ¶ 89.)

After the non-renewal, Plaintiff filed a claim for unemployment benefits. Plaintiff contends that Defendant Board "presented evidence in support of the denial of Plaintiff's unemployment benefits," but that she was nevertheless approved for benefits. (Id. ¶ 91.) Plaintiff charges that the "accusations utilized by Defendant Board in their attempt to deny Plaintiff's unemployment claim were not creditable, and were only used in the furtherance of discriminatory practices perpetrated against the Plaintiff by the Defendant." (Id. ¶ 92.) Plaintiff alleges that she has applied for many jobs but "has not been able to teach because of the non-renewal on her record." (Id. ¶ 97.)

Plaintiff's First Cause of Action is labeled as a claim for violation of procedural due process against all Defendants. Plaintiff states that she is proceeding under section 1983 and section 1988. (Compl. [Doc. #2] at 12.) She claims that Defendants deprived her of her liberty interest in future employment. She says that Defendant Board was aware of the stigmatization and hardship that would follow a non-renewal and failed to provide for adequate pre-deprivation process. Plaintiff contends that the actions of Defendants represent an arbitrary use of governmental power.

4

Plaintiff's Second Cause of Action is against Defendant Thigpen individually for malicious interference with contract. Plaintiff alleges that "an express and/or implied contractual relationship for continued employment existed between Defendant Board and Plaintiff," that Defendant Thigpen knew of this contractual relationship, that Defendant Thigpen willfully gave false statements to Defendant Board and others implicating Plaintiff in misconduct, and by doing so induced Defendant Board not to perform its contractual obligations and to terminate Plaintiff's employment. (Id. ¶¶ 110-117.)

Plaintiff also states that she does not have sufficient information to determine whether her termination was the result of intentional racial discrimination. (Id. ¶¶ 118-119.) She says that she may wish to add such claims in the future. Plaintiff seeks injunctive and declaratory relief as well as damages.

Defendants move to dismiss claiming that, first, Plaintiff cannot establish a deprivation of due process because she has not alleged a protected liberty or property interest. (Defs.' Br. [Doc. #15] at 5-8.) Defendants also argue that Plaintiff failed to appeal the non-renewal of her probationary contract as allowed under North Carolina law, and that she was not entitled to a pre-deprivation hearing. (Id. at 8-15.) To the extent Plaintiff raises contentions regarding racial discrimination, Defendants contend that Plaintiff's Complaint should be dismissed as an attempt to circumvent the limitation period for Title VII claims, because the suit was filed more than 90 days following Plaintiff's receipt of the EEOC's Notice of Rights. (Id. at 10-11.) They also argue that Plaintiff has failed to allege facts to state a claim upon which relief may be granted as to the malicious interference with contract claim. As to that claim, Defendants argue that

5

Plaintiff has failed to allege interference by Defendant Thigpen with a valid contract between the Plaintiff and a third party. Defendants also argue that Defendant Thigpen, as principal, had a legitimate business interest in the performance of one of her teachers and, thus, Plaintiff cannot state a claim for malicious interference. Finally, Defendants contend that claims against Defendant Thigpen are barred by qualified and public official immunity, and that punitive damages are not recoverable in this suit.

II.  DISCUSSION

   A.  Standard

A plaintiff fails to state a claim on which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) when the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

   B.  Fourteenth Amendment Due Process Claim

In her first claim, Plaintiff contends that her procedural due process rights were violated. The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. Procedural due process generally requires fair notice of impending state action and an opportunity to be heard. However, to state a procedural due process claim, "a plaintiff must allege sufficient facts to

support a finding that [she was] 'deprived of life, liberty, or property, by governmental action.'" Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109 (4th Cir. 2011) (quoting Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).) Plaintiff, of course, has not been deprived of life. In both her Complaint [Doc. #2 ¶ 99 & p. 15] and Response Brief [Doc. #23 at 3, 7-12], Plaintiff alleges a liberty interest in her continued employment. Plaintiff does not specifically allege a property interest, but her contentions raise the possibility that she may be attempting to allege deprivation of a property interest as well.

1. Property interest

To the extent Plaintiff may be alleging deprivation of a property interest, the Court concludes that Plaintiff has not stated a due process violation based on the deprivation of a property interest under existing Fourth Circuit precedent. Property interests are created not by the Due Process Clause but by "existing rules or understandings that stem from an independent source such as state law." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Plaintiff alleges in her Complaint that the terms of her employment were governed by North Carolina General Statute § 115C-325(m). (Compl. [Doc. #2] ¶ 13.) Subsection (m) applies to probationary teachers. Subsection (m)(2) is of particular importance. It states that the "board, upon recommendation of the superintendent, may refuse to renew the contract of any probationary teacher or to reemploy any teacher who is not under contract for any cause it deems sufficient: Provided, however, that the cause may not be arbitrary, capricious, discriminatory or for personal or political reasons." N.C. Gen. Stat. § 115C-325(m)(2) (2013).

7

In Sigmon v. Poe, 564 F.2d 1093 (4th Cir. 1977), the Court of Appeals for the Fourth Circuit determined that this exact statutory language (although then codified under a different number) did not create a property interest under the Fourteenth Amendment. Sigmon, 564 F.2d at 1096 ("We are, therefore, of opinion that, while the statute may create a right of action in the State courts, it does not establish a property interest under the Fourteenth Amendment.") Moreover, Plaintiff does not specifically contend that her probationary contract created any property interest, and Plaintiff has not alleged any facts to support the conclusion that she possessed a property interest in her continued employment.

  2. Liberty Interest

Plaintiff claims that she "has not been able to teach because of the non-renewal on her record." (Compl. [Doc. #2] ¶ 97.) At another point in her Complaint, she states that the Defendants "were on notice of the stigma and career ending effect a non-renewal had." (Id. ¶ 100.) Thus, it appears that Plaintiff's claim is that the non-renewal itself is the cause of her inability to find work, rather than any other public statements made by Defendants. The Supreme Court has recognized that protected liberty interests include the freedom to "engage in any of the common occupations of life." Roth, 408 U.S. at 572. However, "it would stretch the concept to[o] far 'to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another.'" Bishop v. Wood, 426 U.S. 341, 348 (1976) (quoting Roth, 408 U.S. at 575, and noting that no liberty interest is implicated by the decision not to retain an untenured college teacher, even if the nonretention "might make him somewhat less attractive to other employers"). By alleging that the non-renewal itself

8

deprived her of a protected liberty interest, Plaintiff has failed to state a claim upon which relief may be granted.

The non-renewal of a contract accompanied by charges of dishonesty, immorality, or other "stigma," could raise a protected liberty interest. See, e.g., Roth, 408 U.S. at 573 (finding no liberty interest where the state "did not base the nonrenewal of [the plaintiff's] contract on a charge, for example, that he had been guilty of dishonesty, or immorality" and "[h]ad it done so, this would be a different case"). The Fourth Circuit considered such a claim in Sigmon, 564 F.2d 1093. In that case, Ms. Sigmon had taught for four years in North Carolina, but her principal recommended that her contract not be renewed for the fifth year. Renewal for the fifth year would have established her as a career teacher under North Carolina law. Following the reasoning of Bishop and Roth, the court noted that to create a liberty interest, a plaintiff must show that the defendant attached some stigma to the non-renewal beyond the bare non-renewal of the contract. The Sigmon court noted that in that case, the school board "did not charge Mrs. Sigmon with dishonesty or immorality, or the like, nor bar her from other public employment in State school systems." Sigmon, 564 F.2d at 1096. Therefore, Ms. Sigmon had not stated the elements necessary to show stigmatization which deprives someone of a Fourteenth Amendment liberty interest. In a later case, the Fourth Circuit stated that no liberty interest is implicated "in the absence of any public charge by the employer that might seriously damage the teacher's standing and associations in his community." Wooten v. Clifton Forge Sch. Bd., 655 F.2d 552, 555 (4th Cir. 1981). In other words, a plaintiff must allege that the defendant made statements in connection with her non-renewal "that imply . . . serious character

9

defects" and not simply incompetence. Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 308-09 (4th Cir. 2006).

In the present case, Plaintiff Welch-Walker's allegations do not state a claim for deprivation of a liberty interest based on imposition of a stigma in connection with the non-renewal. Plaintiff does not allege that Defendants made any public statement at the time that her contract was not renewed. According to her Complaint, Plaintiff received copies of the documents relied upon by Defendant Board, but there is no allegation that Defendants disclosed these documents to the public or otherwise made a public statement regarding Plaintiff's non-renewal. Plaintiff alleges in her Complaint that Defendant Thigpen made some statements concerning Plaintiff to parents prior to her non-renewal. However, these statements were not made close in time to Plaintiff's non-renewal and, at any rate, did not accuse Plaintiff of dishonesty or immorality which would give rise to a liberty interest. See Robertson v. Rogers, 679 F.2d 1090, 1092 (4th Cir.1982) (superintendent telling prospective employers that plaintiff was terminated for "incompetence and outside activities" does not amount to the type of communication which gives rise to a protected liberty interest).

The only allegation which may be construed to touch upon dishonesty is Plaintiff's allegation that Defendant Thigpen "informed Defendant Board that Plaintiff was trying to hide her daughter's disability because Plaintiff had not disclosed the disability on a sheet in Plaintiff's daughter's file." (Compl. [Doc. #2] ¶ 67.) However, Plaintiff does not link this allegation to her non-renewal. Moreover, there is no contention of public dissemination of this allegation. Internal communications within the school system are not considered public statements. See

Luy v. Baltimore Police Dep't, 326 F. Supp. 2d 682, 691 (D. Md. 2004) ("Charges that are made in internal communications with the employer are not thereby 'made public.'") Such lack of public dissemination is also fatal to Plaintiff's claims that Defendant Thigpen improperly placed various documents in her personnel file without notice or without giving Plaintiff an opportunity to respond. See Whiting v. Univ. of S. Miss., 451 F.3d 339, 347 (5th Cir. 2006) (mere presence of defamatory information in confidential personnel file does not amount to a violation of one's liberty rights).

Plaintiff also charges that Defendant Board "presented evidence in support of the denial" of her unemployment benefits. (Compl. [Doc. #2] ¶ 91.) She claims that the Board's accusations in challenging her unemployment benefits were "not creditable, and were only used in the furtherance of discriminatory practices perpetrated against the Plaintiff by the Defendant." (Id. ¶ 92.) These allegations do not suggest that the accusations involved dishonesty or immorality. Moreover, such disclosures by the Board to the state agency deciding Plaintiff's application for unemployment benefits are not public disclosures. See Luy, 326 F. Supp. 2d at 691 ("A state employer also should not be held liable for disclosing information to another state agency at the former employee's request at some time after the employee's termination–in this case in order for Luy to secure unemployment benefits.") (citing cases).

Because Plaintiff has failed to allege sufficient facts showing that she possessed a liberty or property interest in her continued employment, and because no public statements infringing on a liberty interest in future employment have been alleged, she cannot state a claim for the

violation of her due process rights, and her First Cause of Action should be dismissed.[3] Given this conclusion, the Court need not address Defendants' other contentions in support of dismissal of Plaintiff's due process claim.[4]

C.  Malicious Interference with Contract

Plaintiff's Second Cause of Action, and only remaining claim,[5] is that Defendant Thigpen maliciously interfered with her alleged contract with Defendant Board for continued employment. (Compl. [Doc. #2] ¶¶ 110-17.) The elements of this tort under North Carolina law are: (1) a valid contract existed between plaintiff and a third person; (2) defendant knew of such contract; (3) defendant intentionally induced the third person not to perform his or her contract with plaintiff; (4) defendant had no justification for his or her actions; and (5) plaintiff

---

[3] Plaintiff's Complaint alleges only a procedural due process violation, but in her Response Brief, Plaintiff refers to alleged substantive due process violations. Even if the Court considers those contentions, Plaintiff has not stated a substantive due process claim because she has not alleged a Constitutionally-protected interest. Moreover, "[t]he touchstone of due process is protection of the individual against arbitrary action of the government," County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998), and only "the most egregious official conduct" qualifies as constitutionally arbitrary, Huggins v. Prince George's Cnty., Md., 683 F.3d 525, 535 (4th Cir. 2012) (quoting Lewis, 523 U.S. at 846). Substantive due process does not provide a federal forum for review of government personnel decisions, and the allegations in Plaintiff's Complaint simply do not rise to the level of a substantive due process violation.

[4] The Court does note that even if Plaintiff could establish a protected liberty or property interest, she has not stated a claim for violation of her procedural due process rights, given that Plaintiff has alleged that she was provided with notice of the impending decision along with copies of all of the supporting documentation at least 10 days prior to the board's determination, and was also given an opportunity to provide a response prior to the meeting of the board. Defendants also note that Plaintiff had an opportunity for a further hearing that she failed to pursue. Specifically, Defendants note that Plaintiff was entitled to appeal the Board's decision to state court within 30 days but failed to do so.

[5] Although Plaintiff makes statements regarding alleged racial discrimination, she has not alleged a racial discrimination claim in her Complaint, and the Complaint specifically states that Plaintiff "does not currently have sufficient information to determine whether or not [her] termination was the result of intentional racial discrimination." Therefore, because no race discrimination claim has been asserted, the Court need not consider Defendant's contention that any such claim is untimely because Plaintiff failed to file suit within 90 days of receipt of her Right to Sue letter from the EEOC.

suffered damages as a result. Wagoner v. Elkin City School's Bd. of Educ., 440 S.E.2d 119, 124 (N.C. Ct. App. 1994). In Wagoner, the plaintiff was a probationary high school teacher who claimed that her two principals had interfered with her contract with the local board of education. In her Complaint, Ms. Wagoner alleged that the principals were agents, servants, and employees of the board of education. Id. The court noted that principals of a school have "a legitimate business interest in plaintiff's performance under her contract with the Board because they were responsible for overseeing, observing, and evaluating the faculty at [the high school], and for assigning duties to the teachers." Id. Because the principals had a proper motive for their actions, the plaintiff had "failed to show that she [could] make out a prima facie case of malicious interference of contract at trial." Id. at 125.

Similarly, in Privette v. Univ. of North Carolina at Chapel Hill, 385 S.E.2d 185 (N.C. Ct. App. 1989), the plaintiff was a research scientist who charged that two doctors, the director and assistant director of the lab where plaintiff worked, interfered with his employment contract by having him discharged. Plaintiff Privette claimed that the defendants began a pattern of harassment against him because of his association with another doctor who supervised some of the plaintiff's work. Plaintiff Privette claimed that the defendants encouraged other research technicians to make false accusations against him because of this association. Id. at 187. The court found that as the director and assistant director of the laboratory, defendants "had a legitimate professional interest in the plaintiff's performance of his duties" and this interest foreclosed plaintiff from establishing the "without justification" element of malicious interference with contract. Id. at 190-91.

In her Complaint, Plaintiff alleges that Defendant Thigpen was the principal of Colfax Elementary School where Plaintiff worked, that she was "responsible for creating, adopting, and implementing School District polices, practices and or customs," and at all relevant times was "acting in the scope of her employment." (Compl. [Doc. #2] ¶¶ 8-9.) Plaintiff also alleges that Defendant Thigpen was at all relevant times "acting as the agent, servant and/or employee of Defendant Board." (Id. ¶ 14.) Under the reasoning of Wagoner, these allegations establish that Defendant Thigpen had a legitimate business interest in any contract that existed between Plaintiff and Defendant Board, and this interest is fatal to Plaintiff's claim.[6]

Plaintiff does allege, in conclusory fashion, that Defendant Thigpen interfered with her contract based on Defendant Thigpen's "own self-serving motives, objectives and desires." Plaintiff contends that these allegations are sufficient to defeat any qualified privilege of interference that Defendant Thigpen may have possessed. (Response Br. [Doc. #23] at 15.) However, Wagoner and Privette are directly on point and foreclose Plaintiff's claim. Under those decisions, and based on the nature of the allegations in the Complaint, Defendant Thigpen had a legitimate business interest in Plaintiff's alleged contract. Moreover, the factual allegations do not support a claim that Defendant Thigpen was acting based on personal motivations.[7]

---

[6] The Court further notes that it does not appear that Plaintiff has sufficiently alleged the existence of the first element of the tort–a contract with which Defendant Thigpen could have interfered– given that Plaintiff's probationary contract was apparently completed, and she fails to allege any facts suggesting a meeting of the minds for the creation of a second contract for continued employment.

[7] Indeed, Plaintiff's allegations show that Defendant Thigpen received numerous, substantial complaints from parents and students about Plaintiff's teaching performance, and this is not a situation where the only complaints of Plaintiff's performance were from the alleged tortfeasor.

14

Because Plaintiff has failed to allege sufficient facts to state a claim of malicious interference with contract, her final claim for relief should be dismissed.

III. CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants' Motion to Dismiss [Doc. #14] be granted, and that this action be dismissed.

This, the 10th day of December, 2014.

/s/ Joi Elizabeth Peake  
United States Magistrate Judge